Mr. Deprest, you are splitting your time. This clock is yours. When it expires, you are through. Thank you very much. You may proceed. May it please the Court. I would like to start with the foreign exchange gains issue. If I may direct the Court's attention to page 355 of the Joint Appendix. It's in the first volume of the Joint Appendix. The reason why this passage is important is it describes, in Paul Muller's words, what the expense is that we are speaking of. It's the expense, or in this case a gain, that is incurred or is experienced by Paul Muller when the affiliate in the United States, G.M.N. Behring USA, buys the product from the German parent company, which is Paul Muller. It buys the product, it gets shipped to the United States, it arrives in inventory, and sometime after that, Paul G.M.N. Behring USA has to pay its parent company producer in euros, and between the date of the payment and the time that the merchandise arrived in the inventory of the U.S. affiliate, G.M.N. Behring USA, there is a difference in the exchange rate that applies, and from that difference, Paul Muller has reported a gain. This gain was reported in Paul Muller's response, and somehow or another, the Commerce Department has characterized this gain as a selling expense on the resale by G.M.N. Behring USA in the United States. I think that is just a determination that is wrong in so many ways. It's not supported by the record, and it's also contrary to the statutory direction, and to the Commerce's own practice in particular. The statute says that when you build up a constructed export price, you take the price that is observed in the United States, the price that was obtained by the affiliate when it sold to an unaffiliated customer in the United States, you take that price and you deduct, and you add various things. What you deduct is the selling expenses. I cannot, for the life of me, imagine how it is that a gain that is experienced on the purchase of products from the parent, how that can be a selling expense is simply beyond me. It's an offset is the way it's characterized, right? Yeah, that's right. It's obviously not an expense, but it's an offset is the way it's characterized. Yes, what they have done is they reported a number of legitimate selling expenses in the United States experienced on their resales, and then they diminished, reduced that amount by the gain that was observed in the purchase of bearings from the parent company. Why is that any different than a rebate, for example? Well, a rebate in the United States would be something that the GMN bearing USA, the U.S. affiliate, allows its unaffiliated customers in the United States to run their business, and obviously a rebate would be directly having to do with the resale in the United States. This has to do with getting its product that it's going to sell. So, yes, it has an effect on the books, obviously, of GMN bearing USA, but it is not a selling expense. Well, it is related to the sales, and it is booked as an expense item. Yeah, it is related to the sales only in the limited sense that they had to buy the bearings before they could sell them, but that does not make it a selling expense, and in addition, we don't have to just rely on what the statute says. If you perhaps think that the statute is not clear in this, that the concept of a selling expense is not clear, there is the very clear practice of the Commerce Department, which has found expression in its regulations, which is that the Commerce Department is going to take account only of expenses that have to do with the resale in the United States. So if there is an expense that is incurred, or a gain, I guess, incurred on the previous transaction, the preceding transaction, the transaction between the parent company and the U.S. affiliate, that Commerce is going to ignore when it calculates a constructed export price, and a good example of that is the issue that is our second issue, the calculation of inventory carrying cost in the United States. The way Commerce calculates that, they will look at the time that the merchandise spends in inventory in the United States after it arrives in the warehouse in the United States, and then it gets sold. Only that time, the time that it spends traveling from Germany all the way to the United States, that does not get counted. Why? Well, Commerce says that that expense has to do with the preceding transaction, the transaction between the two affiliated companies. It has nothing to do with the resale. Well, this same reasoning should apply here. That money, that gain that Paul Mueller experiences, which I have no quarrel with, that gain, whatever it is, it has nothing to do with the resale. It has to do or it comes out of the transaction that is between the two affiliated parties. In my brief, I also made two additional arguments on the same issue. I believe that it also, in effect, derogates from the statutory instruction on currency conversion. The statute has a very specific instruction on how you're supposed to calculate, I mean convert currencies. And here, of course, they had to do currency conversion in the sense that all of the costs were reported in euros and the whole market prices, obviously, are also reported in euros. And so Commerce did do currency conversions. This particular decision that they made on the foreign currency gains, in effect, derogates from what the statute had in mind. The statute had in mind of making a comparison between two prices as contemporaneous as possible in the whole market price and the U.S. price and have the conversion of the whole market price, in this case, done on using the date of sale, using the conversion that is in effect on the date of sale of the U.S. sale. Now, if you're going to modify your expense calculation based on the transaction between the two companies where they made a foreign exchange gain, you're basically altering what the statute had in mind in terms of currency conversion. And I see my time is almost over. I quickly, on the second issue, the second issue had to do with the calculation of inventory carrying cost, as I said. And there's one thing that I would like to get out of the way from the get-go on that issue. There's going to be a lot of talk about, and there was certainly in the briefs, on exhaustion. There is no exhaustion issue here at all. Commerce made very different determinations. Its first determination on inventory carrying cost was completely different from its second one. And our objections were appropriate to the determinations that we had before us at the time. The first determination of the Commerce Department on the issue, I will stop here and see my time is up. Thank you. All right. Thank you, Mr. DePresse. Mr. Shelley, you have five minutes. Please escort. My name is Herbert Shelley. I represent the SKF companies involved in this anti-dumping review. We only have one issue before the court, and that's the issue of zeroing, which this board has addressed previously. But we submit that the decisions that have been made before have not been based on the same considerations, statutory considerations that we have raised in our brief, and we believe are the correct ones. The previous decisions were based on a Chevron two-step deference. The Commerce Department had the deference to have applied zeroing in the manner it's doing. We would suggest that the statute itself governs how these calculations should be made, and they really should have been considered under Chevron one. The definitions that are being used and have been used in the earlier cases to define dumping are not the controlling sections of the anti-dumping law on how to calculate anti-dumping margins and how to calculate the amount of anti-dumping duties that must be paid in response to a review. The calculations are made under very specific guidelines and provisions in the statute on how to calculate normal value, export price, and constructed export price. Those criteria do not provide for zeroing. Haven't we in the NSK case just simply said until there's a statutory or regulatory change, we're bound to follow the zeroing practices? I think NSK was a slightly different situation than this appeal. NSK was primarily requesting a remand because their decision was under consideration by the World Trade Organization and a panel, and they wanted to keep the entries open as long as possible. And on that point, though, we would suggest that there has been a change, that this complaint was filed only three and a half years ago for this appeal. There have been WTO decisions, which the Commerce Department and the U.S. Trade Representative have followed, and there are currently another series of appeals pending before another panel that began last June in 2007, which this case will be covered by as well. Our position is that the Commerce Department and the U.S. government will be applying the determinations from those panels, and so we would suggest that at this point change has been made since the NSK case and that the courts could take into consideration what the government is actually doing with regard to zeroing in these WTO proceedings as well as having the right to review this statute again, this panel review of the statute, under the proper criteria that we submit as Chevron 1. And so we would suggest at this point the timing has come for the court to either its panel to reconsider it or for the full court to consider the problem. Zeroing is a very technical issue, but it's a very important issue commercially. It makes a tremendous difference in the amounts of dumping liability that is due to the government from an importing company. So it's an issue that we think should be reconsidered under the proper statutory criteria. All right. Thank you, Mr. Shelley. We'll reserve the rest of your time and add it to the rebuttal. Ms. McCarthy. I may please the Court. Timken drew this Court's attention to page 355 of the joint appendix, which is Paul Mueller's brief filed during the administrative proceedings, and in that page Paul Mueller makes it very clear that the foreign currency exchange gains are operating expenses of the affiliate, GMN Bearing USA. Just to be clear, GMN Bearing USA is a selling operation. It has no business other than to sell bearings in the United States. And the reason why this is treated on the normal books and records, this is not a peculiar incident of a treatment of an expense, the reason why these adjustments are made as part of regular general administrative overhead is because this is the expense that's occurred in the United States. It is not directly related to any particular sale in the United States, but it is most certainly related at least in part to the sales in the United States because the affiliate will not pay back Paul Mueller for the bearings until it achieves the sales in the United States. So there is Congress's treatment. What does this have to do with the price of the goods abroad and here in the United States, the value we're trying to find out? What do conversion rates have to do with that, with the sales price? It's a proper adjustment to the offset of the pool of indirect selling expenses. The statute is a statement of administrative action which Congress quoted or cited. We could pick a standard, the gold standard or something, and we could value everything according to that, but certainly conversion rates have little to do with genuine expenses. They're just a different way of calculating the value. Because, well, the statement of administrative action. You've got economists over there. They can figure this out, right? But how could this be an expense? It's an offset to a pool of expenses. It's a more proper adjustment because during the purchase  Originally, Timpigan was making the argument that this was a result of a hedging arrangement or investment arrangement. It just, because of the passage of the time, after the achievement of sales to the unaffiliated selling United States, the affiliate remunerates back to the... You think they're buying the bearings and holding them until the exchange rates change so that they get some benefit on the increased value of the commodity and the new currency? No. That's their intent? You think they're somehow manipulating the process? No, Your Honor. The fact that Congress made a specific finding that there was no evidence whatsoever of any intent to hedge for foreign exchange rate changes. It just so happens, as a matter of the way the selling operation operates its business in the United States, it purchases the bearing from the parents in Germany in euros. There's a passage of time before it remunerates. There's a long process. Let me ask you then a question. I think I understand what you're telling me. What if the currency rate goes the other way? Do you give them a credit? Yes. They would have to if that's how they treat it on the books of records. Congress would have to to be appropriate. This is not a result-oriented, at least certainly from the perspective of the Department of Commerce, it's not a result-oriented calculation. It's simply in a way to make a more accurate adjustment of the regular general administrative operating expenses that are clearly allowed under the statute as indirect selling expenses to be deducted in the calculation of constructed export prices. Can I ask you about zeroing? Certainly. How much longer are we going to get these cases? Your Honor, I'm giving my… If we based our judgment on following Commerce's policy and we're deferring under Chevron to your policy, which policy do we follow? The one you say you're implementing or the one that we keep seeing in cases? Well, the… You say you don't zero anymore, that you're following the WTO decision, and yet we keep getting instances where you do. Commerce, pursuant to the complex, very specific statutory scheme, Commerce is implementing adverse WTO decisions. It has made a determination as to zeroing practice with regard to investigations. It has not made a determination with regard to administrative reviews, and as Mr. Shiller correctly noted… So you're going to be dragged kicking and screaming to the compliance with the law. You'll comply, but only at the last possible time. Your Honor, with all respect, that is a decision for the political branches to make, and the political branches are making that decision… Well, but why couldn't we, as a matter of law, say we're going to follow your policy? Your policy is… You say you've adopted the WTO anti-zeroing decision. We'll implement it. That is limited to investigations. This court in NSK has upheld the practice as a matter of domestic law, and the Statement of Administrative Action clearly contemplated that notwithstanding what may happen after an adverse WTO decision, notwithstanding what may happen after implementation of an adverse WTO decision, as a matter of domestic law, whatever Commerce did previously is reasonable and appropriate as a matter of domestic law, and the Statement of Administrative Action clearly contemplates that there would be this disparity. I mean, that's the statute. That's the scheme. That's just the way the system works, and it is for the political branches to decide how and when the adverse WTO decision shall be implemented. In this case, as Mr. Shelley correctly noted, the implementation, the so-called implementation, as it concerns administrative reviews, is still an alive and pending issue before the WTO, and as this court has repeatedly held, unless and until there's a change in implementation, this court is going to uphold Commerce's interpretation of the statute as reasonable. And if the court has any further questions, we have briefed the issues on inventory carrying costs. We believe that the court did not abuse its discretion in holding that. Timpkin had failed to exhaust its administrative remedies by raising the specific issues before the court, before the agency. With respect to the inventory, yeah. Yeah, with respect to the inventory. Why don't you address with a little more specificity the argument about exhaustion. Mr. DePresse wasn't able to flesh it out, but the briefs flesh it out pretty well. Give me some guidance as to why you think Mr. DePresse's characterization of the sequence of events doesn't make this a good case in which to apply the exhaustion doctrine. Well, there's actually two different types of issues. There's the New Hampshire v. Maine type of issue that first arose in the sense that Timpkin raised a challenge. Commerce remanded and actually heeded Timpkin's advice and made the change in its determination. And then Timpkin wanted to go back to its original position because it did not like the results of that. So we have a clear New Hampshire v. Maine problem. Go back to its original position. That's not quite what it urged, right? Given the change in the approach that was employed the second time around, it had a new objection. Yes, it raised a different objection. And the challenge, what the specific exhaustion issue is, is they raised a general challenge. First, they raised the general challenge to the new methodology that Commerce had implemented at their behest. They said, no, that's not exactly what we wanted. And then they did not raise specific issues regarding freight interest. They never raised those specific issues specifically. And we cited below to the court Rome-Pelenk, which this court has held very clearly, that just simply making general objections is not enough to preserve for purposes of exhaustion. The trial court agreed with us, and we believe that, consistent with Cora Stahl, as a matter of statute, it's within the trial court's discretion to decide whether to apply exhaustion, and Timpkin has not established an abuse of that discretion in this case. Thank you, Your Honor. I ate up some time there, so I didn't want to take it away from the next party. Mr. Marshall? Good morning. May I please report? Timpkin has raised a new argument each time it's had the opportunity to brief these issues. At the administrative level, with respect to the foreign currency exchange game, Timpkin argued that there was no proof that the foreign currency exchange game related to GM and Baron USA, which is Paul Mueller's U.S. affiliate core business. They also alleged that there was no proof that these foreign currency exchanges related to short-term gains and losses, which is actually a distinction that no longer is relevant. Before the Court of International Trade, Timpkin then argued that the statute requires a specific method by which foreign currencies were to be exchanged, and secondly, that the exception to that statutory rule didn't apply in this particular case. And now, before this Court, Timpkin is arguing that the foreign currency exchanges don't relate to U.S. resales. This is all a desperate attempt to bring Paul Mueller back within the anti-dumping order, which has been excluded from by achieving three zeroes in a row. If I could address just a couple of the questions that the Court has posed to my colleagues this morning. One question was, what does the currency conversion have to do with U.S. price or home market price? In short, nothing. We are not determining what the starting price is in computing the dumping margins. What we are determining here with respect to the foreign currency exchange game issue is what is GM and Baron USA's overhead? What are their actual overhead expenses, and how should that be deducted from the starting U.S. price, which is not in question, in computing the dumping margin? Here, and as Congress' well-established practice, is to consider positive expenses and negative expenses, or offsets, which is what we have here. It is not a revolutionary practice. It's a well-tread ground. And Timpkin seems to allege that the statute prevents recognizing offsets altogether, which obviously is not a credible reading of the statute. Secondly, while yes, foreign currency exchanges relate loosely to transactions between Paul Mueller and GM and Baron USA, we would postulate that almost all the expenses for GM and Baron USA in the United States relate to transactions between Paul Mueller and GM and Baron USA. Phone expenses, postal expenses, communications back and forth between the parent and the U.S. resale company. And I don't think anybody would take the position that those expenses are not overhead items that should be recognized and deducted from the U.S. starting price. I think that's all we have on the foreign currency exchange gain issue. And then lastly, with respect to the inventory carrying cost issue, Timpkin takes the position, seemingly contradictorily, that the department's regulations, 19 CFR 302, 351.402b, prevents the recognition of expenses that are realized between the U.S. affiliate and the foreign affiliate. And they rely upon that statute in order to try to deny the foreign currency exchange gain recognized by GM and Baron USA and at the same time try to use that expense to show how, but at the same time that position directly contradicts Timpkin's position on inventory carrying costs. There, they are arguing in favor of recognizing freight and duty expenses on the transit between Germany and the U.S. and computing U.S. inventory carrying costs. So clearly there's a contradictory interpretation that Timpkin's presenting to this court on that particular regulation. And finally, with respect to the exhaustion issue, Timpkin had an opportunity before the agency on its remand determination to argue its point on how inventory carrying costs should be calculated. It did not do so and chose to wait until we got back before the Court of National Trade to do so. And I think the Court of National Trade correctly held that they failed to exhaust the administrative revenues before the department. That rests on our brief. Thank you, Mr. Marshall. Mr. DePrest. Thank you, Your Honors. I have three minutes. You have more than that. Go ahead. At least four. Let me pick up where I left off. On the inventory carrying cost calculation and our supposed failure to raise arguments in time. When Commerce first calculated this, they took whatever was presented by Pohlmuller, which was on the U.S. side, entered value was multiplied by the applicable interest rate. And on the home market side, home market prices were multiplied by the applicable interest rate and then the ratio between the home market prices and the average cost. That calculation had obvious errors and obvious problems with it. And that's exactly what we pointed out. This calculation means that the U.S. calculation and the home market calculation are very different. The home market calculation was done, allocated basically on home market prices, which meant that each time there's a high-priced home market sale, there would be a high adjustment for inventory and carrying cost, which wasn't done on the U.S. side. Plus, the U.S. side was based on what was essentially an affiliated party value. Those are the things that we pointed out with regard to the first determination. Commerce didn't address it in their final results by mistake. Then asked for a remand in the court and got a remand. And then in the remand determination, Commerce said, well, yes, they're right. We had asked Commerce, you know, you should do it consistently. You should do it either both sides based on price or both sides based on cost, but not some hybrid mix between the two. And that's exactly then what Commerce did during the remand. They decided that they weren't going to do it on price, but they were going to do it on cost. And they made a new calculation where the cost in the home market gets multiplied by the applicable interest rate. And then on the U.S. side, exactly the same thing. The cost gets multiplied by the applicable interest rate. And then, you know, that determination, again, it showed what's wrong with this is immunity, obviously, again. You have a calculation which does not take account for the fact that the value of inventory in the United States is by necessity higher than the same product in inventory in Germany. So if you use, under Commerce's calculation, if I assume that the interest rates are the same and the turnover rate in inventory is the same, you would have exactly the same inventory cost calculated for the U.S. and the home market, which is absurd because the product that is made in the home market has to be brought over here. If you look at, and I pointed out the gap in my reply brief, when you value inventory in the United States, that is purchased inventory, not stuff you made here. It is purchased. Well, then you have to account for the fact you have to bring it here. Why didn't you argue for freight duty and brokerage fees when Commerce issued its preliminary order? You mean when they issued their remand determination? Yeah. Yeah. When Commerce issued their remand determination, Commerce waited until it was almost due at the court. This is the two-day window issue? Yes, we had two days. So I will readily admit that the comments that I submitted in those two days, they pointed out the issue, but they were not very clear in what the solution would be. We did propose a solution. We did argue for entered value. We probably thought that entered value included freight. The record is still not clear on what entered value exactly includes. You can read what Paul Mueller says they calculated as entered value, but it doesn't really make clear if this, in fact, includes freight. I mean, I understand that the customs form has, you know, you have to put in the entered value, and then the freight charges are a separate box. So I don't know what actually ended up in their response. So I don't know whether their entered value includes freight. So when we made our comments to the court, we said you should do entered value plus freight, or if it already includes the freight, then of course you don't add it again. But, you know, that's really, but yes, the comments that were submitted to the Commerce Department were perhaps lacking in clarity, but they did identify that, you know, this can't be right if you have, you know, this is merchandise in Germany. Final comments, Mr. DePrest? Pardon? Any final comments? I have no final comments. Thank you very much. Thank you, Mr. DePrest.